Charles L. KING, Plaintiff-Appellee,

v.

EXXON COMPANY, U.S.A. and Exxon Corporation, Defendants-Appellants.

No. 78–2487.

United States Court of Appeals, Fifth Circuit.

June 12, 1980.

---

W. Swan Yerger, Robert T. Gordon, Jr., Jackson, Miss., for defendants-appellants.

Ingram & Matthews, Carroll H. Ingram, Jolly W. Matthews, III, James R. Fowler, Jr., Hattiesburg, Miss., for plaintiff-appellee.

Before WISDOM, FAY and TATE, Circuit Judges.

FAY, Circuit Judge:

Plaintiff-appellee Charles L. King managed a service station owned by defendant-appellant Exxon Corporation. A written Service Station Manager Agreement established the rights and duties of King and Exxon. According to the agreement, Exxon was to employ King for an indefinite period of time; a termination provision specified, however, that "Exxon or Manager may terminate this Agreement at any time by *written* notice to the other delivered in person or mailed to the adress [sic] set forth above." Record, vol. I, at 6 (emphasis added).

Having concluded their employment relationship, the parties now dispute whether there was sufficient evidence to find that Exxon breached the manager agreement by failing to give King the requisite written notice of termination. Assuming that Exxon did breach the agreement, Exxon disputes the award of $20,000 damages to plaintiff King, contending that the jury verdict is grossly excessive, contrary to law, and contrary to the overwhelming weight of the evidence.

Our review of the record reveals ample evidence to support a finding that Exxon breached the termination provision of the manager agreement; we therefore affirm the district court judgment in favor of plaintiff King. We agree with defendant Exxon, however, that the district court judge failed to give the jury a proper guide for determining the amount of damages to be awarded. The judgment for $20,000 is reversed and remanded for a new trial on the damage issue alone.

## I. Facts

We cull the facts of this case from the accumulated testimony of two trials which preceded this appeal. Plaintiff Charles L. King took over the operation of the University Exxon Service Station in Hattiesburg, Mississippi on April 26, 1973. On May 7, 1973, King executed a Service Station Manager Agreement with Exxon. This written agreement set forth the employment arrangement between King and Exxon, and provided, *inter alia,* that the agreement was terminable by either party at any time upon delivery of written notice. The manager agreement specified that King would receive commissions on sales of Exxon-owned products and on service work, in accordance with a schedule—Schedule "A"—attached to the agreement. Both the manager agreement and Schedule "A" provided that Exxon reserved the right to revise and change Schedule "A" from time to time. Record, vol. I, at 5, 7.

King operated the service station pursuant to the agreement through the summer and into the fall of 1973. He claims, however, that the written manager agreement was only a part of the contractual arrangement between himself and Exxon. He testified that he entered into the manager agreement with Exxon with the understanding that he would be made a dealer[1] within ninety days. Exxon's alleged promise of a dealership was made verbally; plaintiff admitted "there was nothing in writing on this." Record, vol. III, at 6. In early October, 1973, King was summoned to the office of Exxon's sales representative for the Hattiesburg area. King went to the meeting fully expecting to discuss the details of a dealership contract, only to learn that Exxon had no plans to make him a dealer at this time. Instead, the Exxon representative presented King with certain changes which Exxon was implementing in its manager agreements. King advised the representative that he did not like the proposed changes in his manager's contract, whereupon he was told, "Chuck, you have no choice. You sign it or we will put you out."[2] Record, vol. II, at 88. King testified that he refused to sign a new manager agreement and that he told the representative, "[Y]ou are going to have to put me out of here." *Id.* at 193. He then asked that his brother-in-law, the assistant manager of the service station in question, be given an opportunity to take over as manager of the station.

Following his meeting with the Exxon sales representative, King continued to manage the University Exxon station until November 27, 1973, when he was physically checked out of the station. On that date, the Exxon sales representative came out to the service station and inventoried the Exx-

---

1. King testified that a dealership provided "a great deal more potential for money earnings . . ., and that's why I entered into the original manager's agreement with Exxon." Record, vol. III, at 6.

2. The testimony indicates that the Exxon representative did not have a copy of the new manager's agreement with him at the meeting. The purpose of the meeting was only to go over the proposed changes and to get some input from the managers. Record, vol. II, at 248–49.

on-owned products in stock. King signed the Exxon inventory list, which included a box with a checkmark next to the words "manager change."[3] King later testified that he was given no choice about being checked out of the service station; that he had not requested that Exxon remove him from the station; and that he did not agree to being checked out of the station. Record, vol. II, at 89, 183–84. After the inventory had been completed and signed, the Exxon representative asked King to sign a mutual cancellation and termination agreement;[4] King refused to sign because the termination was not mutual, and because he did not wish to leave the station. King testified that he never received written notice from Exxon advising him of the termination of his contract, and that he never gave Exxon written notice that he desired to terminate the contract himself.

After he was put out of the University Exxon station, plaintiff King unsuccessfully sought other employment in the Hattiesburg area. He subsequently went to Baton Rouge, Louisiana, where he obtained a job as truck driver with the company that had employed him prior to his position with Exxon.

## II. The Lawsuit and the First Trial

Plaintiff King filed a diversity action against Exxon in December, 1975. His complaint alleged that Exxon had breached an oral contract to make King a dealer operator of the Exxon service station in Hattiesburg, Mississippi. In his portion of a joint pretrial order, plaintiff further contended that Exxon had breached its written contract in removing plaintiff from the premises and taking over his business. Record, vol. I, at 392. Exxon denied all of King's allegations while affirmatively alleging in the alternative that the plaintiff had terminated the written manager agreement, that the termination was mutual, or

that the defendant had terminated the agreement in accordance with the contract terms.

The case was tried before a jury on June 29 and 30, 1977. A verdict was entered for Exxon, the jury finding that no oral contract had been made by the parties, and that the defendant had not breached the written agreement by failing to comply with its written termination provisions. Special Interrogatories, Record, vol. I, at 400–03. Plaintiff King moved for judgment n.o.v. and/or new trial; the court granted the motion for new trial on the written contract issue. In its order granting a new trial, the court stated:

> The testimony of all the witnesses at the trial clearly established that the Defendant, Exxon Corporation, breached the written contract involved herein by failing to give written notice of its intention to terminate the contract between it and the Plaintiff, Charles L. King, in accordance with the terms of said contract. The overwhelming weight of the evidence showed that the Defendant, Exxon Corporation, did in fact breach the written contract. Therefore, this Court is of the opinion that the Jury's verdict as to whether there had been a breach of the written contract was contrary to the overwhelming weight of the evidence to such a degree that it shocked the conscience of the Court. The Court is further of the opinion that the Plaintiff's Motion for a New Trial as to whether there had been a breach of the written contract should be granted in order to prevent a manifest miscarriage of justice.

Record, vol. I, at 407–08

## III. The Second Trial

Charles King's suit against Exxon was tried a second time on May 11, 1978. The jury was instructed to consider only the issue of "whether the plaintiff's written managerial contract, . . . with the

---

**3.** King testified that he signed the inventory form because he did not want to be held accountable for the thousands of dollars worth of inventory at the station. Record, vol. II, at 184.

**4.** The Mutual Cancellation and Termination Agreement was never signed by King or by Exxon; the Exxon representative signed it only as a witness.

defendant Exxon, was terminated in accordance with the provision thereof or whether it was in that respect breached by the defendant by failing to comply with the termination requirement contained in Paragraph 9 thereof." Record, vol. III, at 196–97. The judge emphasized to the jury that "we have no claim and you are not to consider any claim of any kind for breach of any oral contract with reference to any possible dealership." *Id.* at 196. The jury found for the plaintiff and assessed his damages at $20,000. Following the entry of judgment on the verdict, defendant Exxon filed motions for judgment n.o.v. and new trial, as well as a motion for remittitur or, alternatively, for a new trial on damages. The court denied all of defendant's motions. Defendant Exxon now appeals both the grant of plaintiff's motion for new trial after the first trial and the denial of its own post-trial motions after the second trial.

We affirm the district court's grant of plaintiff's motion for new trial after the first trial of the action, and the denial of defendant's motion for judgment n.o.v. after the second trial. We reverse, however, the district court's denial of defendant's motion for a new trial on the issue of damages, for reasons set out below.

## IV. Plaintiff's Motion for New Trial

■ Defendant Exxon asserts that the district court erred in granting plaintiff King's motion for new trial after the first trial. We disagree. The proper standards for granting a new trial, and for appellate review of that grant, are very clearly set out in *Bazile v. Bisso Marine Co., Inc.,* 606 F.2d 101, 105 (5th Cir. 1979).

As far as the motion for a new trial, the trial judge can grant a new trial if he believes the verdict is contrary to the weight of the evidence. See, e. g., *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940); *Marsh v. Illinois Central Rail Co.,* 175 F.2d 498 (5th Cir. 1949). Although a trial judge cannot weigh the evidence when confronted with a motion notwithstanding the verdict, in a motion for a new trial the judge is free to weigh the evidence. As an appellate court, our review of the granting of the motion for a new trial is severely limited—the lower court's action is discretionary and we may interfere only when the court abuses its discretion or fails to exercise it. *Hampton v. Magnolia Towing Co.,* 338 F.2d 303, 306–307 (5th Cir. 1964).

In the instant case, as in *Bazile,* "[a]fter careful consideration of the record we are not prepared to hold that the trial judge abused his discretion in granting the motion for a new trial." *Id.* at 105. Plaintiff's uncontradicted testimony clearly indicated that Exxon never gave any written notice of termination to King, and this fact was readily admitted by all three of Exxon's witnesses at the first trial. Responding to plaintiff's request that the jury be instructed to find in his favor on the issue of breach of the written contract, the court said:

All right, I'll say this, the plaintiff has testified without contradiction that he was never given any written notice of any kind terminating the contract. All of the defendant's witnesses said they had never given him any and never knew of any being given him by anyone on behalf of the defendants. Defendants contend that he voluntarily terminated the contract himself by either informing their agent and/or by signing the inventory. I am not too impressed by that claim. I am not too sure that that constitutes substantial compliance with that termination provision requirement of that written contract and particularly in view of the fact that it is undisputed that he refused to sign a mutual cancelation [sic] agreement and it was never signed and he has never given any written notice at all to defendants and it is undisputed that he either had a choice of signing a new managerial agreement or being terminated, but I am going to, with a great deal of reluctance and trepidation, I am going to refuse that instruction and let the jury decide that issue of fact—decide that as

an issue of fact and see what the jury does in that regard.

Record, vol. IV, at 138.

In the order granting plaintiff's motion for new trial, the court opined that the jury's verdict as to whether there had been a breach of the written contract was contrary to the overwhelming weight of the evidence. The granting of a new trial under these circumstances thus comports with the requirement that new trials not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great, and not merely the greater, weight of the evidence. *Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980); *Spurlin v. General Motors Corp.*, 528 F.2d 612, 620 (5th Cir. 1976).

██ In deciding whether the district court properly exercised its discretion by granting a new trial, we give great deference to the court's firsthand experience of the witnesses, their demeanor, and the context of the trial. *See Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360 (5th Cir. 1980); *Love v. Sessions*, 568 F.2d 357 (5th Cir. 1978). Here, we find no abuse of discretion. The order granting plaintiff's motion for new trial is affirmed.

## V. Defendant's Motion for Judgment N.O.V.

Following entry of a judgment for $20,-000 in plaintiff's favor at the second trial, defendant moved for judgment non obstante veredicto. We affirm the district court's denial of the motion.

██ In reviewing the denial of a judgment n.o.v., we apply the standard set forth in *Boeing v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969).

> On motions . . . for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied

The record in this case clearly reveals sufficient substantial evidence to support the jury's conclusion. As emphasized by the trial court, the uncontradicted testimony was probably sufficient to uphold a directed verdict in favor of King as to the issue of written notice of termination; there clearly was none as required by the manager agreement. The trial court correctly denied Exxon's motion for j.n.o.v.

██ Defendant Exxon also argues that the district court committed reversible error during the second trial by admitting testimony regarding the alleged oral agreement to make plaintiff a dealer at the University Exxon station. Exxon contends that this testimony was irrelevant, immaterial, and highly prejudicial.

The record reveals that the district court admitted testimony of the alleged oral agreement over Exxon's continuing objection in order to obtain a full explanation of the course of dealings between King and Exxon. The court stated that it was admitting this testimony only to show the circumstances surrounding the written agreement and to establish the discussions leading to Exxon's final actions.[5]

We find no reversible error in the admission of testimony about the alleged oral dealership agreement. Any potential for prejudice was eliminated by the court's explanation to the jury each time such testimony was presented, and by the court's final instruction to the jury that "[i]n this

---

5. The court, in admitting testimony about the oral agreement, also pointed out that counsel for Exxon raised the issue of the oral agreement during his opening statement to the jury. Record, vol. III, at 30–31.

case we have no claim and you are not to consider any claim of any kind for breach of any oral contract with reference to any possible dealership, as I've told you previously." Record, vol. III, at 196. Although we have reservations about the wisdom of admitting testimony on an issue not before the jury, in this case we find any possible error to be harmless. *See Berdeaux v. Gamble Alden Life Insurance Co.*, 528 F.2d 987 (5th Cir. 1976).

## VI. The Issue of Damages

After entry of the $20,000 judgment for plaintiff, defendant Exxon moved for remittitur, or in the alternative for a new trial on damages. Exxon argued, and continues to assert, that the judgment was not supported by the evidence and was so grossly excessive as to evince jury bias, prejudice and sympathy. Exxon also claims that the jury was not given a proper guide for determining damages. Although the amount of damages can hardly be labeled excessive, we agree that the jury was not given sufficient guidance in determining this issue; we therefore remand for a new trial on damages.

At the close of the second trial, the judge instructed the jury that if it found that plaintiff had sustained actual damages as a proximate result of a breach of the written contract, "then in that event the plaintiff . . . would be entitled to recover a verdict in an amount that would reasonably compensate him for loss . . . of net profit proximately resulting from said breach. . . ." Record, vol. III, at 198. The judge defined net profit for the jury, and indicated that the net profits earned by the plaintiff during the months prior to his termination could form a sufficient basis for computing the net profits lost as a result of defendant's breach of contract.[6] *Id.* at 199.

---

6. The judge instructed the jury on damages as follows:

> I instruct you that if you find from a preponderance of the evidence in this case that the plaintiff has sustained actual damages as a proximate result of a breach of the written contract with the defendant Exxon with respect to termination thereof, then in that event the plaintiff is entitled to—would be entitled to recover a verdict in an amount that would reasonably compensate him for loss, if any, shown by a preponderance of the evidence of net profit proximately resulting from said breach, if any you so find from a preponderance of the evidence in this case.
> And by net profit—net profit is defined as that gross amount that would have been received pursuant to the business being managed by the plaintiff, that is, the amount that he would have earned by managing the business in question, less the cost of running that business during the life of that contract in question. However, you must reduce the amount of any such award, if any you so make to the plaintiff based upon a preponderance of the evidence, by any amount earned by the plaintiff through other employment subsequently obtained by him.
> I instruct you that you may not deny the plaintiff recovery of damages if you find from a preponderance of the evidence that he should prevail against the defendant, that is, is entitled to a verdict against the defendant based on the evidence and the instructions given to you herewith, merely because he is unable to prove with absolute certainty a

> mathematical value of his losses. As long as plaintiff can show with reasonable certainty his loss of net profit then he may recover the same, if any should be proved by a preponderance of the evidence to have proximately resulted from the alleged breach of contract on the part of the defendant if any you so find from a preponderance of the evidence.
> Although you may not base your verdict upon guesswork or speculation with reference to the amount of damages, if any, which plaintiff allegedly sustained, nevertheless the lack of a perfect measure does not preclude or prevent you from awarding plaintiff damages if you find from a preponderance of the evidence that he is entitled to same. If you find from a preponderance of the evidence that net profits made by the plaintiff in the management of the defendant's service station pursuant to the written managerial contract in question during the several months prior to the date of November 27, 1973 form a sufficient basis upon which you may compute the net profits if any lost by the plaintiff as a result of the defendant's breach of contract, if any you so find from a preponderance of the evidence, then you may award him such amount, if any, that you find from a preponderance of the evidence that he suffered as a proximate result thereof, of course reduced by the amount of any earnings that he had in any employment after the termination of his employment with the defendant.
> Record, vol. III, at 198–200.

As a result of the court's instructions, the jury awarded the plaintiff damages of $20,-000. At trial, plaintiff King introduced into evidence business records indicating the net profit earned by him during each month of his employment as manager of the Exxon station. The records showed that during the seven months of his employment King earned an average net profit of roughly $2900 per month. *See* Record, vol. III, at 25–28. Comparison of King's average monthly net profit with the jury's award of $20,000 suggests that the jury awarded the plaintiff lost net profits for a seven month period, *i. e.*, the duration of King's employment pursuant to the manager agreement.

Defendant Exxon argues that the court failed to provide the jury with any guideline on the time period over which it could assess damages on the based on plaintiff's loss of net profits. The court instructed the jury that plaintiff's loss was to be determined by the amount of net profit that King would have earned as manager "during the life of that contract in question." Record, vol. III, at 198. The contract in question, however, was one of indefinite duration; it had no stated life. Exxon urges that the proper measure of damages for the wrongful termination of a contract of indefinite duration is the net profit that would have been earned during the period following the date of wrongful termination which would have constituted reasonable notice. *See Shearon v. Boise Cascade Corp.*, 478 F.2d 1111 (8th Cir. 1973); *Odell v. Humble Oil & Refining Co.*, 201 F.2d 123 (10th Cir.), *cert. denied*, 345 U.S. 941, 73 S.Ct. 833, 97 L.Ed. 1367 (1953).

We find support for Exxon's proposed measure of damages in *Louisiana Oil Corp. v. Bryan*, 165 Miss. 157, 147 So. 324 (1933), involving breach of an employment contract. There, the written contract provided that either party could terminate the contract upon ten days' written notice to the other; the lawsuit was based upon the employer's failure to give the required written notice of termination. The jury found that the employee, who earned ninety dollars per month under the contract, had been orally discharged on December 31. The court

awarded the employee damages of three dollars per day for ten days, stating that "[w]here the contract of employment expressly specifies that the employer may terminate the service at any time upon giving notice, a recovery is limited to the notice period." 147 So. at 325. Similarly, in *Mississippi Power Co. v. Cochran*, 167 Miss. 705, 147 So. 473 (1933), a contract to supply electricity was not for a definite or fixed term beyond one year, but was a continuing one providing that after the expiration of one year, either party might terminate it by giving at least six months' written notice of intention to do so. The court held that "[t]he wrongful discontinuance of service without giving this written notice was actual and peremptory notice of the termination of the contract, and was such a breach of the contract as rendered the appellant liable for all damages accruing as a result of the breach *within the six-month notice period.*" 147 So. at 475 (emphasis added).

In the instant case, as in *Louisiana Oil Corp. v. Bryan*, the contract at issue could be terminated by either party upon written notice. In *Bryan*, however, the terminating party was bound to give ten days' written notice prior to termination, and the court based its award of damages on the ten day notice period. The agreement between King and Exxon did not specify a notice period; the termination provision merely stated that either party could terminate at any time by written notice. Although there is no mention in the contract of a period of notice prior to termination, Mississippi caselaw requires that reasonable notice be given. In *United State Finance Co. v. Barber*, 247 Miss. 800, 157 So.2d 394 (1963), the court stated that "a contract for an indefinite period, such as one for employment . . ., which by its nature is not deemed to be perpetual, may be terminated at any time on giving reasonable notice." *Accord, Roberts v. Southern Wood Piedmont Co.*, 571 F.2d 276 (5th Cir. 1978); *Hazell Machine Co. v. Shahan*, 249 Miss. 301, 161 So.2d 618 (1964). Unlike Exxon's manager agreement, the contracts at issue in *United States Finance Co.* and the other

cited Mississippi cases did not include termination provisions; because the contracts were of indefinite duration, the court construed them to be terminable at will upon reasonable notice. Exxon's manager agreement expressly states that it is terminable at will, upon written notice, but the agreement is silent as to the required period of notice. Logic, consistency, and prior Mississippi jurisprudence suggest, however, that the Mississippi courts would construe Exxon's manager agreement to require *reasonable* written notice of termination.

Applying the measure of damages developed in *Louisiana Oil Corp. v. Bryan* to the wrongful termination of a contract of indefinite duration terminable at will upon *reasonable* written notice, we find that the proper measure of damages is the net profit that would have been earned by the plaintiff during that period of time constituting reasonable notice of termination. What constitutes reasonable notice of termination in this case is a question to be resolved by the jury, since reasonable notice will vary in accordance with the facts and circumstances of each case. *See, e. g., Hazell Machine Co. v. Shahan*, 249 Miss. 301, 161 So.2d 618, 624 (1964) ("All of the testimony reflects that six months' notice of termination would, under the type of business here engaged in [marketing rebuilt automobile motors], be reasonable.") In the new trial on the damage issue in this case, the trial court judge should instruct the jury to decide what period of time would constitute reasonable notice of termination under the facts and circumstances disclosed by the evidence. The jury should then be instructed to award to the plaintiff the net profits he would have earned during the period of time following defendant's wrongful termination which would have constituted reasonable notice of termination.[7] Such in-

structions will furnish the jury with a proper guide for measuring plaintiff's damages; they will not be "left to grope in the darkness, without any light to guide them . . . ." *Meridian City Lines, Inc. v. Baker*, 206 Miss. 58, 39 So.2d 541, 545 (1949).

VII. Conclusion

We affirm the judgment of the district court in favor of plaintiff Charles King. We also affirm the court's granting of plaintiff's motion for new trial after the first trial, and the denial of defendants' motion for judgment notwithstanding the verdict after the second trial. We reverse, however, the denial of Exxon's motion for new trial on the issue of damages. Because the jury was not properly instructed on the issue of damages, we remand the case to the district court for a new trial on that question only.

*AFFIRMED* in part; *REVERSED* in part; and *REMANDED.*

**7.** We ask the district court, in its new trial on damages, to consider the wisdom of submitting special interrogatories to the jury. The submission to the jury of written interrogatories along with a general verdict form enables both the trial and appellate court to know precisely how the jury arrived at its award. *See* Judge Brown's concurrences in *Little v. Bankers Life*

*and Casualty Co.*, 426 F.2d 509, 512 (5th Cir. 1970) and *Horne v. Georgia Southern & Florida Railway Co.*, 421 F.2d 975, 980 (5th Cir. 1970). *See also Brown, Federal Special Verdicts: The Doubt Eliminator, in Proceedings of the Annual Judicial Conference, Tenth Judicial Circuit of the United States*, 44 F.R.D. 245, 338 (1967).