[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
————————————————

No. 19-13514
Non-Argument Calendar
————————————————

D.C. Docket No. 1:17-cv-21168-RNS

FANNY QUEVEDO,
CARLOS QUEVEDO,

Petitioners - Appellants,

versus

IBERIA LINEAS AEREAS de ESPAÑA
SOCIEDAD ANÓNIMA OPERADORA CO.,

Respondent - Appellee.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

(April 27, 2020)

Before JORDAN, NEWSOM, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

Fanny Quevedo ("Quevedo") appeals the district court's denial of her motion for new trial. For the reasons set forth below, we affirm.

## I.    FACTUAL AND PROCEDURAL HISTORY

In May 2015, Quevedo, a septuagenarian from Miami, Florida, made plans to visit the Shroud of Turin in Italy by taking a commercial flight from Miami to Milan with a layover in Madrid. Unfortunately, during the first leg of Quevedo's trip, a heavy tripod fell on her pelvis, causing her significant pain. Although in pain and sleep deprived, she continued her trip, and after landing in Madrid, she boarded an Iberia Lineas Aereas de España ("Iberia") flight to Milan. The flight was scheduled to land in the Milan-Malpensa airport, with Genoa and Milan-Linate serving as alternative airports.

Although Quevedo was assigned a window seat, another traveler, Marta Lopera ("Lopera"), allowed her to sit in the aisle seat; Lopera sat in the window seat, and the middle seat remained unoccupied. Before takeoff, the Iberia flight crew provided the passengers with routine safety instructions, including an instruction to fasten their seatbelts when the captain turned on the seatbelt sign and a recommendation to keep seatbelts "fastened at all times" during the flight. Quevedo, who had previously flown a number of times, testified that she heard those instructions and understood their importance.

2

Iberia has a company policy in place to ensure that every seatbelt is fastened when the seatbelt sign is turned on and when the flight crew secures the cabin. If the flight crew cannot see a passenger's seatbelt when securing the cabin, they are required to move obscuring garments or wake up sleeping passengers. When the seatbelt sign is turned on, the flight crew, approximately every fifteen minutes, reminds passengers to have their seatbelts fastened.

Captain Angel Cereceda Daza ("Captain Cereceda"), the flight's captain, turned off the seatbelt sign after takeoff. Quevedo testified that, while the seatbelt sign was off, she unbuckled her seatbelt to allow Lopera to retrieve an item from the overhead bin.[1] At this time, Quevedo was still in pain and sleep deprived from the first leg of her trip. After Lopera returned to her seat, Quevedo lifted her armrest, draped her jacket around herself, slumped toward the adjacent seat, and fell asleep.

As the plane approached the Milan-Malpensa airport, Captain Cereceda directed the flight crew to secure the cabin and ensure that the passengers' seatbelts were fastened. He then turned on the seatbelt sign. The weather around the airport quickly worsened, however, and the Milan-Malpensa airport was forced to close. The flight then entered a holding pattern near Genoa. After learning that the Genoa airport was no longer accepting traffic, Captain Cereceda diverted to Milan-Linate.

---

[1] Lopera, however, testified that she did not leave her seat during the flight.

3

Captain Cereceda directed the flight crew to inform the passengers of the diversion. The seatbelt sign was still turned on from the approach to Milan-Malpensa. There was testimony that during the diversion, the cabin was secured twice. Flight Attendant Diego Rubio Sans ("Rubio") secured Quevedo's section of the cabin during the second inspection. According to Rubio, his row-by-row check was quick but thorough:

> Our checks are very simple. This is the aisle here. Three on either side, and you go, trying to not show that you are checking. You go like this, you go smiling, you go to one row, then to the row behind it, and you turn around and you go up on the other side.

Rubio testified that when he reached Quevedo, he determined that Quevedo's seatbelt was fastened, despite her hands and jacket obstructing his view, based on how her jacket was situated and where her hands were placed. Rubio believed that since he saw that both ends of Quevedo's seatbelt were "tight" and that the buckle was in place, Quevedo's seatbelt was fastened.[2]

After finishing his row-by-row check, Rubio returned to his seat, which was approximately four feet from Quevedo, and fastened his seatbelt. Immediately thereafter, the plane momentarily jolted, causing Quevedo's seatbelt to fall off her lap and dangle. Seeing this, Rubio unbuckled himself and attempted to fasten Quevedo's seatbelt.

---

[2] Another flight attendant testified that he saw Quevedo's seatbelt was fastened. He also testified that Quevedo was sitting in the middle seat, not the aisle seat.

Suddenly, the airplane experienced extreme turbulence and precipitously dropped approximately 3,000 feet. Both Quevedo and Rubio hit the cabin ceiling and fell to the cabin floor two or three times. Rubio broke his ribs, and Quevedo sustained severe injuries to her back, hip, and ankle, among other injuries. Only Quevedo and Rubio were seriously injured. After the airplane landed in Milan-Linate, Quevedo received medical treatment.

Quevedo sued Iberia for damages under Article 17 of the Convention for the Unification of Certain Rules Relating to International Carriage by Air ("Montreal Convention"). S. Treaty Doc. No. 106-45, 1999 WL 33292734. Under Articles 20 and 21 of the Montreal Convention, Iberia asserted affirmative defenses of comparative negligence and to limit liability. *Id.* Ultimately, the case proceeded to trial. During the seven-day trial, Quevedo argued that Iberia negligently failed to ensure that her seatbelt was fastened and negligently diverted to Milan-Linate. Iberia argued that Quevedo herself was negligent because she failed to fasten her seatbelt before falling asleep.

The jury heard testimony from Iberia's flight crew, including Rubio and Captain Cereceda, from Quevedo, and from Captain Donald Lindberg ("Captain Lindberg"), an expert witness called by Quevedo. Captain Lindberg testified that the diversion to Milan-Linate was a mistake, as Iberia knew of the poor weather conditions in the area and should have supplied the airplane with additional fuel for

5

the trip.  Because the airplane lacked this additional fuel, Captain Lindberg asserted, the airplane was not able to land in alternative airports in the area.  Captain Lindberg further testified that Captain Cereceda, in light of these conditions, should have declared a fuel emergency while in the holding pattern and landed in the Genoa airport.

Captain Cereceda disagreed with Captain Lindberg's assessment.  Captain Cereceda testified that the airplane's fuel supply was above minimum requirements and that the airplane had ample fuel while in the holding pattern; therefore, he contended there was not any basis to declare a fuel emergency.  Captain Cereceda also testified that he could not land at the airport in Genoa, because it was not accepting traffic, and that landing in Milan-Linate was otherwise proper.  Captain Maria Teresa Lumbreras, Iberia's safety director, similarly testified that the airplane had sufficient fuel and that landing in Milan-Linate was proper.

Before the jury began deliberations, Quevedo moved for directed verdict, which the district court denied.  After deliberations, the jury found that Quevedo and Iberia each were negligent but found Quevedo ninety-nine percent at fault.  Quevedo moved for a judgment as a matter of law, or in the alternative, a new trial, which the district court also denied.  The district court reasoned that the jury verdict was not contrary to the great weight of the evidence.  The district court stated that the jury was presented with undisputed evidence that Quevedo's seatbelt was not fastened

and that a reasonable person under the circumstances would have fastened her seatbelt before going to sleep. Moreover, the district court noted that the only two individuals seriously injured during the flight—Quevedo and Rubio—did not have their seatbelts fastened. Quevedo filed a timely notice of appeal.

## II. STANDARD OF REVIEW

We review a denial of a motion for new trial for an abuse of discretion. *See Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 310–11 (11th Cir. 1988). A district court should grant a motion for new trial only when "the verdict is against the great, and not merely the greater, weight of the evidence." *King v. Exxon Co., U.S.A.*, 618 F.2d 1111, 1116 (5th Cir. 1980).[3] The deferential abuse of discretion standard "is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed." *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1498 (11th Cir. 1987). Additionally, we have held that on "a motion for a new trial[,] the judge is free to weigh the evidence." *Rabun v. Kimberly–Clark Corp.*, 678 F.2d 1053, 1060 (11th Cir. 1982) (quoting *King*, 618 F.2d at 1115); *see also Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982) ("[W]hen independently weighing the evidence, the trial court is to view not only that evidence favoring the jury verdict but evidence in favor of the moving party as well.").

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted all Fifth Circuit decisions issued before October 1, 1981, as binding precedent.

## III.  ANALYSIS

Quevedo argues that the district court should have granted a new trial because the jury's allocation of fault was against the great weight of the evidence.  She contends that there is overwhelming evidence in the record showing that Iberia failed to ensure that Quevedo's seatbelt was secure and improperly diverted to Milan-Linate.  We disagree.

We note the "exacting" standard of review for a district court's denial of a motion for a new trial, as well as "our duty to safeguard the role of the jury." *Rabun*, 678 F.2d at 1061.  This deferential standard of review is well founded.  Juries and district courts have "firsthand experience" of observing witnesses, "their demeanor, and the context of the trial."  *King*, 618 F.2d at 1116.  Indeed, juries are better able to make credibility determinations and resolve conflicting evidence.  *See Rosenfield*, 827 F.2d at 1498.   This deferential standard applies to jury determinations of comparative fault.  *See Jones v. CSX Transp.*, 287 F.3d 1341, 1344 (11th Cir. 2002) (affirming district court's denial of motion for a new trial because the jury's determination that the plaintiff was ninety-five percent negligent with respect to his respiratory ailments was not against the great weight of the evidence), *reinstated in relevant part*, 337 F.3d 1316 (11th Cir. 2003).

Applying that standard, we find that the district court did not abuse its discretion in denying Quevedo's motion for a new trial, as the jury's verdict was not

8

against the great weight of the evidence.  For example, Rubio described his row-by-row cabin check on the flight, testifying that:

> [o]ur checks are very simple.  This is the aisle here.  Three on either side, and you go, trying to not show that you are checking.  You go like this, you go smiling, you go to one row, then to the row behind it, and you turn around and you go up on the other side.

Rubio also explained the positioning of Quevedo's jacket and how he was able to see her seatbelt with the jacket covering her.  Rubio was frequently asked whether he believed Quevedo's seatbelt was fastened and whether his row-by-row check was adequate.  His answers were often compared to the answers he previously gave during a deposition.  The jury had the opportunity to observe Rubio's testimony, make a credibility determination, and find facts based on his testimony.

The jury also heard conflicting testimony from Captain Lindberg and Captain Cereceda on whether landing the plane at Milan-Linate airport was proper.  While Captain Lindberg opined that landing in Milan-Linate was improper and that Captain Cereceda should have declared a fuel emergency and landed in Genoa, Captain Cereceda disagreed, testifying that landing in Milan-Linate was proper, that the airplane had enough fuel,  that declaring a fuel emergency would be inappropriate, and that the Genoa airport had stopped accepting traffic.  Again, we note that the jury was able to weigh and resolve the conflicting testimonies.  *See Rosenfield*, 827 F.2d at 1498; *see also Ard v. Sw. Forest Indus.*, 849 F.2d 517, 522 (11th Cir. 1988) (noting deference to the "jury's determination when issues of credibility are involved

or the facts are in sharp conflict"); *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1558–59 (11th Cir. 1984) (same).

Additionally, Quevedo and Rubio were the only two individuals with unfastened seatbelts, and they were the only two individuals who were severely injured by the turbulence. Quevedo herself stated that she has "done a bit of traveling" and that securing her seatbelt could be "essential for [her] life." She heard the preflight instructions and Iberia's recommendation to have seatbelts fastened during the flight. Since the simple act of fastening her seatbelt before falling asleep very likely could have prevented Quevedo's injuries, there is some evidence to support the jury's decision to find her ninety-nine percent at fault for her injuries. *See Rosenfield*, 827 F.2d at 1498. "Whether the trial judge or this court would have reached the same conclusion is irrelevant, as long as there is some support for the jury's decision." *Id.*

Accordingly, we hold that the district court did not abuse its discretion when it determined that the jury's verdict was not contrary to the great weight of the evidence.

## IV.    CONCLUSION

Because the jury's verdict was not contrary to the great weight of the evidence in this case, we affirm the district court's denial of Quevedo's motion for new trial.

**AFFIRMED**.

10