**Joe RABUN, Plaintiff-Appellant, Cross-Appellee,**

v.

**KIMBERLY–CLARK CORPORATION, Defendant-Appellee, Cross-Appellant.**

No. 81–7452.

United States Court of Appeals, Eleventh Circuit.

June 18, 1982.

---

William R. McCracken, Harris, McCracken & Jackson, Augusta, Ga., for plaintiff-appellant, cross-appellee.

George W. Fryhofer, Waynesboro, Ga., for defendant-appellee, cross-appellant.

Before FAY, VANCE and ARNOLD [*], Circuit Judges.

FAY, Circuit Judge:

The appellant, Joe Rabun, seeks to overturn the court's entry of a partial judgment notwithstanding the verdict and conditional grant of a new trial, following the jury's award of $60,000.00 in compensatory damages regarding Rabun's dual claims under Georgia law of breach of contract and malicious interference with contractual relations. We conclude that the evidence introduced at trial, viewed according to the standards applicable in considering motions for a judgment n. o. v. and a new trial, supports the jury's verdict. Determining, reluctantly, that the trial judge abused his discretion in granting the above motions, we hereby reverse his rulings and reinstate the jury's verdict.

## I. TALES FROM THE GEORGIA WOODS

The appellee, Kimberly-Clark Corporation, owns 730 acres of land, known as the Higginbotham Tract, in Sandersville, Washington County, Georgia. In June of 1977, Kimberly-Clark, through its employee-representatives, Albert Sullivan, District Forester and Logging Superintendent; Jim Findley, Operations Manager; and Melvin Henson, Procurement Forester, entered into an oral contract with the appellant, an independent logger, for the latter to cut and stack timber on the tract. Rabun was to be paid $17.75 for each cord of timber cut and stacked.[1] At trial, Kimberly-Clark insisted that the oral contract, encompassing Rabun's cutting and stacking of the timber, additionally required the appellant to haul the logs to Kimberly-Clark's mill in Waynesville, Georgia. The appellant disputed this version of the contractual terms, contending that Kimberly-Clark had agreed to be responsible for delivering the lumber to its mill in exchange for which 25 cents per cord would be deducted from payment to Rabun. The appellant further alleged that Kimberly-Clark had promised to advance him his monies based on the amount of logs stacked.

After commencement of the logging operations, Kimberly-Clark failed both to pick up the stacked timber and to make the agreed advances. As a consequence, Rabun lacked sufficient funds to pay his crew members and his assorted logging equipment debts. With the purported knowledge and approval of Mel Henson, a Kimberly-Clark representative, the appellant hauled some of the stacked timber off the tract and sold it to the Norton Lumber Company and the Pulliam Lumber Company. After additional employees of Kimberly-Clark learned of Rabun's sale of timber to third parties, they threatened Rabun with criminal prosecution for theft. However, they agreed to forbear from bringing such prosecution and to permit Rabun to complete the original contract if Rabun would sign a promissory note for $15,842.33, the value of the timber sold. Rabun signed the note and the accompanying security agreement, which promised repayment to Kimberly-Clark at an interest rate of 10%. On the same day, September 2, 1977, Rabun was paid an advance of $2,800.00. Despite this, Kimberly-Clark immediately terminated the appellant's contract to continue cutting and stacking timber and informed Rabun that it

---

[*] Honorable Richard S. Arnold, U. S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. A cord is a logging term denoting 5350 pounds of timber. R. Vol. III at 12.

would press criminal charges against him. Fearful of the threatened prosecution and possible incarceration, Rabun left the state with his family and several crew members.

As soon as he did so, Melvin Henson, Kimberly-Clark's Procurement Forester, falsely notified Welborn Davis, a farm equipment and machinery dealer and principal creditor of Rabun, that the appellant had left the country, quite possibly with the equipment. Davis informed Bill Teets, owner of Teets International Trucks, and Rabun's second major creditor, of these developments. Rabun had been current on all debt obligations for the three skidders and one wheel-loader[2] which he had obtained from Davis on a rental-purchase basis and for which he had already paid $20,000.00. Rabun was likewise current on remaining payments which he owed Bill Teets for the purchase of two trucks. Nevertheless, after being informed of Rabun's fleeing the country, both creditors repossessed all the equipment.

Rabun brought suit for willful breach of contract, seeking to obtain lost profits, and for malicious interference with contractual relations, in order to recoup lost equity in the logging equipment repossessed by third party creditors. He sought recovery of both compensatory and punitive damages flowing from these claims.[3] Kimberly-Clark counterclaimed for $14,607.44 plus 10% interest, representing the amount of money due on the promissory note for timber cut on its land and sold to other lumber companies by Rabun.[4]

At trial, three expert witnesses, including the appellant, offered unopposed testimony as to the value of the repossessed equipment and the equity interest of Rabun in it. In addition, Rabun testified, over no objection by the defense, as to his profit of $7.00 per cord. A stipulation was entered that, following termination by Kimberly-Clark of the appellant's contract, 3510.63 cords of timber were cut and removed from the Higginbotham Tract by Wayne Smith, a logger hired by Kimberly-Clark to complete the work.

At the close of trial, the court instructed the jury that if they were to find the promissory note to have been supported by consideration of Kimberly-Clark's promise to forbear from prosecution, which is illegal in Georgia as violative of public policy, they were to reduce the 10% interest rate specified in the note to the customary liquidated rate of 7%. The jury returned a verdict for the appellant in the amount of $60,000.00 in compensatory damages. No punitive damages were awarded. In addition, the jury found for Kimberly-Clark on the counterclaim; however, it reduced the interest rate of repayment to 7%, thus determining that Rabun's signature of the note had been induced, unlawfully, by Kimberly-Clark's threat of criminal prosecution.[5]

---

2. A skidder is a device which draws cut, fallen trees to an area where they are stacked. Once gathered by the skidder, the cut trees are stacked by means of a high lift equivalent to a front-end loader.

3. In his complaint, Rabun sought general damages in the amount of $150,000.00; punitive damages in the amount of $300,000.00; attorney's fees of $15,000.00; as well as costs and interest.

4. Although the face amount of the promissory note was $15,842.33, evidence adduced at trial and agreed upon by both parties established that the amount due under the note was $14,607.44. Kimberly-Clark prevailed on its counterclaim on the note, pursuant to which the jury awarded it $14,607.44.

5. The jury was reluctant in finding for Kimberly-Clark on the counterclaim. The foreperson of the jury, Ms. Cecil, revealed this in a prepared comment made to the court following her recitation of the verdict:

The Court: Now, Ms. Cecil, you stated a moment ago that you wanted to make a comment or an expression.

Ms. Cecil: Yes, if it was appropriate.

The Court: Now that the verdict has been published, your jury service, for all practical matters, is now over and you may make any expression or comment that you may wish.

Ms. Cecil: I wanted to say that there was some question among the minds of the jurors, in the feelings expressed by the jurors, and I did not want this Court to feel that we condoned the debt that Mr. Rabun owed to Kimberly-Clark and that was our dilemma about signing the second piece of paper concerning the obligation to pay that money to Kimberly-Clark.

Although concluding that the jury had determined willful breach of contract on the part of Kimberly-Clark, the trial judge refused to award Rabun any more than his lost profits on timber which he had actually cut and stacked. Accepting Rabun's assertion that 200 loads[6] of logs had been stacked on the land at the time Rabun left Georgia and that their value was $17.50 per cord, less $90.00 per load for hauling, the judge resolved to limit the appellant's award to $17,000.00. He refused to allow the appellant additional recovery of lost profits for timber which he would have cut had he rightfully been permitted to complete the contract.

After an oral hearing, the trial judge granted Kimberly-Clark's motion for a judgment notwithstanding the verdict as to the claim for malicious interference with contractual relations. He granted conditionally, a motion for a new trial on the same claim, in the event the judgment n. o. v. would be reversed or vacated on appeal. From the partial grant of a judgment n. o. v. and the conditional grant of a new trial, Joe Rabun brings this appeal.

## II. UNSTACKING THE LEGAL CORDS

### A. *Judgment Notwithstanding the Verdict*

The accepted standard for disposing of a judgment n. o. v. frames our analysis of the trial court's action:

> On motions ... for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other

hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied . . .

*King v. Exxon Co., U.S.A.*, 618 F.2d 1111, 1116 (5th Cir. 1980) (citing *Boeing v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969)).

In determining whether "the facts and inferences point ... overwhelmingly in favor of one party," *id.*, the judge is not permitted to weigh the evidence which has been introduced on both sides. *See, e.g., Glazer v. Glazer*, 374 F.2d 390, 400, *cert. denied*, 389 U.S. 831, 88 S.Ct. 100, 19 L.Ed.2d 90 (1967). Instead, he or she is obliged to make a prior, more basic determination of whether any credible evidence has been proffered by the non-moving party:

> The question of the sufficiency of the evidence, when viewed in this way, is one that has been the subject of a great variety of verbal formulations, couched in generalities that are not readily applied to any particular set of facts. The fundamental principle is that there must be a minimum of interference with the jury. As good a statement of the test as any is from a recent decision of the Second Circuit: Simply stated, it is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.

C. Wright & A. Miller, 9 Federal Practice and Procedure—Civil at 545–46 (1981) (citing *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970)). *See also Pemberton v. Pan Am. World Airways, Inc.*, 423 F.2d 426, 429 (5th Cir. 1970).

The appellant based his cause of action for malicious interference on allegedly

---

The Court: Was that a unanimous feeling?
Ms. Cecil: It was my opinion that it was a unanimous feeling.

**6.** In lumberman's terms, a load represents a quantity of timber which can be placed on a

truck and delivered to a mill. Although not a fixed amount, a load may not exceed approximately 73,300 pounds, the maximum allowable weight, under state law, of a truck travelling on Georgia highways. R. Vol. III at 18.

intentional activity by employees representing Kimberly-Clark Corporation which resulted in repossession by Rabun's creditors of trucks and other logging equipment in which he owned a substantial equity. Malicious interference with contractual relations constitutes an intentional tort under Georgia law, for which damages are recoverable:

> The right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie.

Ga.Code § 105–1401.

■ The debtor-creditor relationship is a contractual one under Georgia law; both parties to the credit contract possess a property right in it. Compensation for intentional injury of such a contract by third parties may be recovered pursuant to the above statutory provision. *Piedmont Cotton Mills v. H. W. Ivey & Co.*, 109 Ga.App. 876, 137 S.E.2d 528 (1964).

In support of his claim, Rabun introduced testimony regarding interference on the part of employees of Kimberly-Clark. Welborn Davis, a principal creditor of the appellant, was questioned as to the circumstances motivating his repossession of logging equipment which Rabun had obtained from him on a rental-purchase basis:

Q And who had physical possession of this equipment, prior to Joe leaving the state of Georgia?

A He had possession.

Q And when did this equipment come into your possession?

A I was told by Mr. Henderson from Kimberly that he had left and they didn't know where he was going or where they were, so I went and brought the four pieces of equipment back into my place.

Q You said Mr. Henderson?

A Henson or something.

R. Vol. III at 36.

Subjected to additional interrogation on cross-examination by counsel for Kimberly-Clark, Davis stuck firmly to his version of the facts, revealing evidence, even more damaging to the defense, consisting of Mel Henson's false notification to him that Rabun had left the country:

Q Don't you remember, or isn't it true, that when Mr. Henson came to see you he was telling you that Mr. Rabun was not on the property, but he was asking you if you knew where Rabun was and if perhaps you had used your equipment to move this equipment to some other tract?

A No, that's not the way I remember it. He made the statement that he thought he had left the country. If I had not thought Mr. Rabun had gone I would not have moved the equipment.

R. Vol. III at 38.

Later in his testimony, Davis revealed that he had disclosed this information, conveyed to him by Henson, to Bill Teets, another major creditor of Rabun. As a result, Teets likewise repossessed the trucks which he had sold to Rabun on credit, despite Rabun's up-to-date payment of his obligations on the vehicles. Finally, Rabun himself testified as to the reason his Ford pickup vehicle was repossessed:

Q Why did Ford Motor Credit come and get your trucks?

A Because Melvin Henson told them I was out of the country and didn't have no way of paying for the vehicles. He told them I had went to Mexico with my equipment.

R. Vol. III at 125–26.

He continued his testimony regarding additional loss of two trailers in which he had an equity:

Q What happened to your two trailers?

A They were sold at a sheriff's sale in Jefferson County.

Q How did the sheriff get the equipment?

A Kimberly-Clark called the bank and told them I didn't have any work and I didn't have any way of paying for them, that I had left the country.

R. Vol. III at 127.

■ It should be noted that maliciousness is not necessarily to be equated with personal hostility. *Luke v. DuPree*, 158 Ga. 590, 124 S.E. 13 (1924). Rather, under

Georgia law, it is manifested by conduct, the natural consequence of which is interference with a contract:

"Interference with contractual relations is an intentional tort, and if intentional interference is to be required, it presupposes knowledge of the plaintiff's interest, or, at least, of facts that would lead a reasonable man to believe in their existence. See Prosser, Torts, 2d Ed., 1955, pp. 732–735.

However, T. W. Tift's act of going upon the land of General Warehouse 2, Inc. and demolishing the work that had been accomplished on its bridge constitutes conduct unlawful in itself regardless of any specific intent to injure the petitioner in its contractual relations. Under the doctrine that one must be presumed to intend the consequences of his unlawful act, it must be accepted that Tift intended to injure the petitioner in its contractual relations.

It is a question of fact, and thus for the jury, whether the defendant has played a material and substantial part in causing the plaintiff's loss of any benefits of the contract."

*Piedmont Cotton Mills v. H. W. Ivey & Co.*, 109 Ga.App. 876, 137 S.E.2d 528 (1964).

█ Certainly, it is reasonable to suppose that the intended natural consequence of Kimberly-Clark's employee's informing the appellant's creditors of his fleeing Georgia, possibly with his equipment, was repossession of that equipment. Furthermore, in assessing the damages owed Kimberly-Clark under the promissory note, the jury reduced the amount of interest due on the note's repayment to 7%, revealing its acceptance of Rabun's contention that consideration for the note was an illegal promise to forbear from criminal prosecution of Rabun. The existence of such an averted threat, coupled with unimpeached testimony by the plaintiff and his creditor, Welborn Davis, regarding statements by Kimberly-Clark employees that Rabun had left the country, amount to credible evidence of malicious interference with Rabun's contracts with his creditors; surely reasonable people are capable of believing unimpeached testimony of trial witnesses.

In our review, we are, of course, compelled to afford deference to the trial judge's ruling. We remain unconvinced, however, that the trial judge in the instant case adhered to the appropriate standard in exercising his discretion. While acknowledging that assessment of the credibility of witnesses should not enter into a disposition of the motion, the judge went on to voice concern regarding the sufficiency of evidence as to the appellant's tort claim. His announced consideration of the heavy balance of evidence favoring Kimberly-Clark was inappropriate in determining whether or not to grant a judgment notwithstanding the verdict:

I had great concern at the close of the evidence and at the close of the plaintiff's evidence about the sufficiency of the evidence to allow the case to go to the jury on the case of malicious interference of a contract right. Having reviewed the record and having heard the arguments of counsel, my concern on that point has become considerably magnified, and I feel that I am forced to draw the conclusion that there is not sufficient evidence to support any verdict in that regard. There is a legal insufficiency of the evidence, not just as to an evidentiary [sic] question, but a question of the weight of the evidence, there is a legal insufficiency in that aspect of the case also.

A verdict by the jury to the extent that it deals with malicious interference with a contractural [sic] right is contrary to the evidence and strongly against the weight of the evidence.

The weight of the evidence is strongly against that verdict and I find that it is, with respect to that, contrary to law and the evidence.

R. Vol. IV at 41–42.

Having engaged in a weighing process, the trial judge ostensibly neglected to recognize the existence of credible evidence supporting the jury's verdict. Accordingly, we reverse his partial grant of a judgment notwithstanding the verdict.

**B.** *Motion For A New Trial*

■ The trial court granted a conditional motion for a new trial to afford Kimberly-Clark a new trial on the single claim of malicious interference, in the event the partial judgment n. o. v. were to be vacated or reversed on appeal. We commence our review of the trial court's ruling with an articulation of the governing standard:

> As far as the motion for a new trial, the trial judge can grant a new trial if he believes the verdict is contrary to the weight of the evidence. See, e.g., *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940); *Marsh v. Illinois Central Rail Co.*, 175 F.2d 498 (5th Cir. 1949). Although a trial judge cannot weigh the evidence when confronted with a motion notwithstanding the verdict, in a motion for a new trial the judge is free to weigh the evidence.

*King v. Exxon Co., U.S.A.*, 618 F.2d at 1115 (citing *Bazile v. Bisso Marine Co., Inc.*, 606 F.2d 101, 105 (5th Cir. 1979)).

Before a new trial may be granted, the verdict must be found contrary to "the great, and not merely the greater weight of the evidence." *Id.* at 1116. As in review of a judgment notwithstanding the verdict, extreme deference must be given to a court's grant of a new trial. Because of the trial court's "firsthand experience of the witnesses, their demeanor, and the context of the trial," *Exxon* at 1115, his ruling is reviewable only for abuse of discretion. *Bazile v. Bisso Marine Co., Inc.*, 606 F.2d 101, 105 (5th Cir. 1979); *Hampton v. Magnolia Towing Co.*, 338 F.2d 303, 306–07 (5th Cir. 1964).

After a verdict was returned in favor of the defendant in *Exxon*, the trial court granted a new trial, concluding that the jury's finding of a contractual breach by the plaintiff was contrary to the overwhelming weight of the evidence. That evidence consisted of clear and uncontradicted testimony by four witnesses, including the plaintiff, that Exxon had never given any written notice of termination to the plaintiff of the parties' written contract. We affirmed the trial court's decision.

In contrast to the testimony by four different witnesses opposing the jury's ultimate conclusion in *Exxon*, testimony by two witnesses in the instant case supports the jury's verdict. As discussed *supra*, Welborn Davis and Joe Rabun both offered accounts of statements by Kimberly-Clark's employees which contained false and misleading information and which tended naturally to result in repossession of equipment. This testimony was neither objected to nor impeached.

By contrast, testimony of defense witnesses Melvin Henson and Albert Sullivan, employees of Kimberly-Clark, as to the amount of wood which had been stacked by the plaintiff at the time his performance of the contract ceased was disputed by three of the appellant's witnesses, all former crew members employed by Rabun. The latter individuals testified that considerably more wood had been left stacked on the Higginbotham Tract than had been admitted by Kimberly-Clark's representatives. Later, during the trial, Kimberly-Clark's representative, Melvin Henson, testified as to his belief all along that Rabun was a "freeloader out to get something for nothing." R. Vol. III at 201. Viewed together, the contested nature of the above defense testimony and the negative comments by Henson, a key Kimberly-Clark figure, were reasonably construable as indicative of ill will towards Rabun. Balancing this, as well as the remaining evidence presented by the defense, against the uncontested proffer by the appellant's witnesses as to statements made by Kimberly-Clark's employees impugning Rabun's ability to pay logging equipment debts, we are unable to accept the trial judge's conclusion that "the great, and not just the greater weight of evidence" favor Kimberly-Clark's denial of malicious interference with contractual relations.

The trial judge offered another reason for granting a new trial. He interpreted the jury's failure to impose punitive dam-

ages as a rejection of the appellant's claim of malicious interference. We find no support for this equation. Under Georgia law, damages recoverable for malicious interference may be compensatory as well as punitive. Ga.Code §§ 105–1401, 105–2001. The judge acknowledged this in his instructions to the jury at the close of trial:

As I mentioned earlier, the plaintiff is seeking to recover punitive or exemplary damages, which are defined in Georgia law as follows:

"In every tort, there may be aggravating circumstances, either in the act or in the intention, and in that event, the jury may give additional damages, either to deter the wrongdoer from repeating the trespass or as compensation for the wounded feelings of the plaintiff."

These damages *may be awarded* where there has been, in the act of intention of a tort, wilful misconduct, malice, fraud, wantonness, or oppression, or an entire want of care which would raise the presumption of a conscious indifference to consequences. If you find any of these elements present, in the event you decide for the plaintiff, you would be authorized to hold the defendant liable for exemplary or punitive damages *in addition to actual damages.* (emphasis added).

R. Vol. II at 16.

We note that in his prayer for relief, the appellant sought $150,000.00 in general or compensatory damages. This figure included his lost equity in the repossessed equipment, which he claimed at trial had been engendered by Kimberly-Clark's malicious interference. Given these circumstances, it would appear that the return of a verdict awarding compensatory damages is not irreconcilable with vindication of Rabun's cause of action for malicious interference. Competent, credible evidence existed as to lost profits, based both on the number of cords which had been cut and stacked by Rabun but hauled off the tract by his successor, Wayne Smith, after the willful breach by Kimberly-Clark, and on the amount of timber which Rabun would have cut and stacked had he been permitted to complete the contract, along with evidence of the value of his lost equity in repossessed items.

Furthermore, the instant jury was instructed to render a general verdict; it was not requested to reply to specific interrogatories posed by the court which, if answered inconsistently, would have required invalidation of the verdict. Rather, the judge charged the jury as follows: "Whether or not to make an award of punitive or exemplary damages is a matter exclusively within the province of the jury." R. Vol. II at 17. Thus, even assuming the jury's award to have been inconsistent with a finding of malicious interference, such a conflict is of no consequence. In an area in which the jury has complete discretion, i.e., the award of damages, it is fully entitled to be inconsistent.

Because great deference must be accorded the trial judge, our standard of review is, of necessity, an exacting one. However, we must remain mindful of an equally significant, countervailing task: our duty to safeguard the role of the jury. Having had their day in court, the parties are entitled to a jury determination based on properly admitted evidence. The trial judge is empowered to invade the sacrosanct arena of the jury by granting a new trial only in the event of an extreme dearth of such credible evidence. "Abuse of discretion exists if the jury verdict was clearly within the ambit of possible awards supported by the evidence." *Fratelli Gardeno, S. p. A. v. Caribbean Lumber Co., Inc.,* 447 F.Supp. 1337, 1343 (S.D.Ga.1978) (citing *Bonura v. Sea Land Service, Inc.,* 505 F.2d 665, 670 (5th Cir. 1974)). After carefully considering the record, we are left with no choice but to invalidate the judge's conditional grant of a motion for a new trial as based on an improper assessment of the evidence introduced at trial.

The judgment is hereby REVERSED and the jury's verdict, awarding the appellant, Joe Rabun, $60,000.00, is hereby reinstated.