**John F. RIXEY, Individually and as Administrator of the Estate of Thomas Corneth Rixey, Deceased, Plaintiff–Appellant,**

v.

**WEST PACES FERRY HOSPITAL, INC., A Georgia Corporation, Defendant–Appellee.**

No. 89–8171.

United States Court of Appeals, Eleventh Circuit.

Nov. 1, 1990.

William C. Lanham, Clark H. McGehee, Johnson & Ward, Atlanta, Ga., for plaintiff-appellant.

Daryll Love, Robert P. Monyak, Thomas K. Foster, Love and Willingham, W. Ray Eckl, Drew, Eckl & Farnham, Atlanta, Ga., for defendant-appellee.

Before HATCHETT and CLARK, Circuit Judges, and MORGAN, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this diversity of citizenship case, a jury found a doctor and hospital liable for medical malpractice and awarded substantial damages. We are asked to determine whether the district court properly granted motions for judgment notwithstanding the verdicts, a new trial, and a conditional new trial. Concluding that the district court erroneously granted these motions, we reverse.

## FACTS

On April 18, 1986, Thomas C. Rixey, age 24, began experiencing shortness of breath and a tight chest. The following day Rixey went to the Humana Med–First Center, Smyrna, Georgia, for treatment, in the morning and in the afternoon. Because Rixey's condition grew progressively worse, he went to the emergency room at West Paces Ferry Hospital, Atlanta, Georgia (West Paces).

The events at the hospital are hotly disputed. Rixey arrived at West Paces Ferry Hospital emergency room at 8:55 p.m., and

shortly thereafter suffered a respiratory arrest. Emergency room personnel inserted an endotracheal tube in his throat. At 9:25 p.m., Dr. Andrew Zadoff, a board-certified pulmonologist, took over Rixey's care. Dr. Zadoff obtained a chest X-ray which showed air in the subcutaneous neck tissues and some mediastinal air. Dr. Zadoff placed Rixey on a mechanical ventilator and prescribed morphine as a sedative.

Around 11:45 p.m., Dr. Zadoff left West Paces without informing either the emergency room physician, Dr. Robert Sasine, or Rixey's attending nurses and respiratory therapist about the air noted in the X-ray, and the possibility that Rixey would develop a tension pneumothorax while being mechanically ventilated. About 11:55 p.m., the respiratory therapist, Barbara Segers, went to the hospital cafeteria for dinner. At approximately 12:26 a.m., Rixey began turning blue. Nurse Jody Frazier removed Rixey from the mechanical ventilator and began ventilating him manually with a ventilator bag. Frazier simultaneously paged Segers who arrived within a few minutes and began manually compressing Rixey's chest. The heart monitor reflected cardiac arrythmia, then a flat line, and at 12:29 a.m. Frazier activated the code 99 emergency button, signaling that Rixey had arrested.

Segers soon discovered that Rixey's scrotum was ballooned-out with air. She found the scrotal air immediately before the code was called, and notified Dr. Sasine, the emergency room physician, who responded to the code 99, of this discovery when he arrived. According to Dr. Sasine, Segers did not inform him of her discovery when he arrived. Rather, Dr. Sasine testified that air was found in Rixey's left chest, left abdomen, and scrotum "well into" the code.

In any event, Dr. Sasine made two unsuccessful attempts to defibrillate Rixey's heart. After a hospital employee called Dr. Zadoff via his beeper, Dr. Zadoff directed that bilateral chest tubes be immediately placed in Rixey's chest to relieve pressure on the lungs and heart. At trial, Dr. Zadoff testified that, at that time, he presumed that Rixey had a pneumothorax (i.e.

accumulated air between the visceral and parietal pleura of the lung) or a tension pneumothorax (i.e. accumulation of air in the pleural cavity which occurs when an opening in the tissues inside the lung acts as a one-way valve, allowing air to enter the pleural cavity but not to leave it). Dr. Sasine implanted the left chest tube at approximately 12:46 a.m., and Dr. Zadoff implanted the right tube at approximately 12:50 a.m., when he returned to West Paces.

At about 1 a.m., Rixey's heart began to contract in an irregular manner. Subsequent neurological checks revealed that Rixey had no brain function. He died. The precipitating cause of Rixey's death was a tension pneumothorax which resulted in the collapse of his lungs and cardiac arrest.

## PROCEDURAL HISTORY

John F. Rixey, Thomas Rixey's father, brought this lawsuit individually and as administrator of the Estate of Thomas Corneth Rixey, deceased. In this opinion, John F. Rixey will be referred to as "the administrator."

In November,. 1986, the administrator filed a two-count complaint seeking damages for the wrongful death of his son. The administrator alleged professional medical negligence against West Paces and Dr. Zadoff on the following theories: (1) that Dr. Zadoff negligently failed to insert chest tubes in Rixey's chest before leaving the hospital at 11:45 p.m. (failure to insert tubes allegation); (2) that Dr. Zadoff negligently failed to alert Dr. Sasine or intensive care unit (ICU) personnel that it might be necessary to implant chest tubes very quickly at the first sign of a tension pneumothorax (failure to alert allegation); (3) that Dr. Zadoff negligently prescribed excessive doses of morphine (excessive morphine allegation); (4) that the ICU personnel negligently failed to monitor Rixey's condition (failure to properly monitor allegation); (5) that respiratory therapist Segers failed to report Rixey's distended scrotum to Dr. Sasine immediately upon his arrival after the code (failure to notify alle-

gation); and (6) that Dr. Sasine negligently failed to insert chest tubes in a timely manner.

After the administrator presented his case to the jury, the district court granted Dr. Zadoff's motion for a partial directed verdict on the excessive administration of morphine allegation and West Paces's motion for a directed verdict on the administrator's allegation that Dr. Sasine acted negligently during the code. The jury returned a verdict against West Paces and Dr. Zadoff for $520,000.

West Paces and Dr. Zadoff then moved for judgment notwithstanding the verdicts (JNOV), and new trials. The district court (1) granted Dr. Zadoff's motion for a JNOV on the failure to alert allegation, (2) denied his motion for a JNOV on the failure to insert tubes claim, and (3) granted West Paces's motion for JNOV as to both the failure to properly monitor allegation, and the failure to notify Dr. Sasine allegation. Additionally, the district court granted Dr. Zadoff's motion for a new trial on the failure to insert tubes allegation, and granted Dr. Zadoff and West Paces a conditional new trial as to those allegations on which it entered a JNOV.

## CONTENTIONS

The administrator contends that the district court erred when it granted Dr. Zadoff's and West Paces's motions for JNOV. According to the administrator, the district court improperly weighed the evidence, improperly determined the credibility of witnesses, and ignored substantial evidence in the record reflecting Dr. Zadoff's and West Paces's negligence. The administrator also contends that the district court abused its discretion when it granted the various motions for new trials because the jury's verdicts were not contrary to the great weight of the evidence.

In response, Dr. Zadoff and West Paces contend that the district court properly granted the motions for JNOV. Dr. Zadoff and West Paces argue that Rixey failed to introduce substantial evidence that either West Paces's or Dr. Zadoff's actions or inactions proximately caused Rixey's death.

Further, Dr. Zadoff and West Paces maintain that the district court properly granted the motions for new trials because the jury's verdict is contrary to the overwhelming weight of the evidence.

## ISSUES

We address the following issues: Whether the district court erred in granting West Paces's and Dr. Zadoff's motions for JNOV and for new trials.

## DISCUSSION

### I. Standard of Review

 A judgment notwithstanding the verdict is permissible only when, without weighing the credibility of witnesses, the facts and inferences point so strongly and overwhelmingly in favor of one party, that a reasonable jury could not arrive at a contrary verdict; where substantial conflicting evidence exists in the record, a judgment notwithstanding the verdict is improper. *See Watts v. Great Atlantic and Pacific Tea Co.,* 842 F.2d 307, 309–10 (11th Cir.1988) (quoting *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (en banc)). When deciding a motion for JNOV, the district court must view the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion. *See Watts,* 842 F.2d at 309 (quoting *Boeing Co. v. Shipman,* 411 F.2d at 374). "In determining whether 'the facts and inferences point ... overwhelmingly in favor of one party,' the judge is not permitted to weigh the evidence which has been introduced on both sides. Instead, [the judge] is obliged to make a prior, more basic determination of whether any credible evidence has been proferred by the non-moving party." *Rabun v. Kimberly–Clark Corp.,* 678 F.2d 1053, 1057 (11th Cir.1982) (quoting *King v. Exxon Co., U.S.A.,* 618 F.2d 1111, 1116 (5th Cir.1980)) (citations omitted).

A motion for a new trial " 'should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence.' " *Hewitt v. B.F. Goodrich, Co.,*

732 F.2d 1554, 1556 (11th Cir.1984) (quoting *Conway v. Chemical Leaman Tank Lines, Inc.,* 610 F.2d 360, 363 (5th Cir.1980)). "A district court ruling on a motion for a new trial is generally reviewed under an abuse of discretion standard. When the trial court grants a new trial our review is broader and requires a stringent application of the same standard." *Hewitt,* 732 F.2d at 1556. "This is because when the jury verdict is set aside usual deference to the trial judge conflicts with deference to the jury on questions of fact." *Hewitt,* 732 F.2d at 1556.

## II. Dr. Zadoff's Post-trial Motions

### A. *Failure to Implant Chest Tubes Allegation*

■ At trial, the administrator sought to prove that Dr. Zadoff negligently failed to insert chest tubes before leaving the hospital. After the jury returned a verdict for the administrator, Dr. Zadoff moved for a JNOV and new trial on the failure to insert tubes allegation. The district court denied Dr. Zadoff's motion for a JNOV concluding that, on the basis of testimony of the administrator's expert witness, Dr. Joseph Bussey, "it cannot be said that the facts and inferences point so strongly and overwhelmingly in favor of the Defendant that reasonable men could not arrive at a contrary verdict."

The district court, however, granted Dr. Zadoff's motion for a new trial on this issue. In arriving at this decision, the district court evaluated the credentials and testimony of the parties' expert witnesses and found Dr. Bussey's opinion, the administrator's expert, to be "of only slight value" because: (1) the foundation for Dr. Bussey's expert opinion was "limited", (2) the opinion was ambiguous, and (3) Dr. Bussey was a biased witness.

■ Dr. Bussey has been practicing general surgery since 1972, and treats "people with pulmonary problems all the time" including patients on mechanical ventilators.

Under Georgia law, an expert physician witness in a medical malpractice case need not be a specialist in the area of medicine practiced by another expert physician witness. *Beatty v. Morgan,* 170 Ga.App. 661, 317 S.E.2d 662, 664 (1984).

Dr. Bussey testified that the 9:40 p.m. X-ray showed some subcutaneous air in the neck and mediastinum, and that the most likely explanation for the air was a hole in Rixey's lung. Dr. Barbara Erwin, the radiologist who read the X-ray, concluded that the presence of the subcutaneous air makes the exclusion of a small pneumothorax difficult. Dr. Zadoff did not seriously challenge this testimony. Indeed, Dr. Zadoff admitted in deposition testimony that the air noted in the X-ray "implies there's a hole in the lung."

The testimony establishes that mechanical ventilation is a known factor increasing the probability of a pneumothorax or tension pneumothorax, a life-threatening condition. In fact, Dr. Bussey testified that when a mechanical ventilator is operated at 70 centimeters of pressure over an extended period of time, a significant percentage of patients will develop a pneumothorax which will turn into a tension pneumothorax. Before Dr. Zadoff left the hospital at about 11:45 p.m., the pressure setting on Rixey's mechanical ventilator was increased to 85.

Based upon his medical training and the facts of this case, Dr. Bussey offered competent testimony that absent a warning to Dr. Sasine or ICU personnel prior to leaving the hospital that it might be necessary to implant chest tubes very quickly, Dr. Zadoff negligently deviated from the applicable standard of care by failing to insert chest tubes before leaving the hospital. Although Dr. Zadoff's expert testified that chest tubes should never be inserted prophylactically, Dr. Bussey unambiguously concluded that the insertion of chest tubes was indicated, and would not have been simply prophylactic.*

* Q. Now, Doctor, we have heard testimony in this court that prophylactic chest tubes are never inserted. Is that correct?

A. I think that might be something that would be another argument, but this is not a prophylactic use of chest tubes. You have a clear

In support of this opinion, Dr. Bussey noted that chest tubes, if managed properly, pose no serious life-threatening complications. Moreover, Dr. Bussey opined that had chest tubes been implanted prior to Dr. Zadoff's leaving the hospital, Rixey would have lived.

Finally, the fact that Dr. Bussey had testified previously on behalf of plaintiffs and had received fees does not necessarily render his opinion worthless. Dr. Zadoff's counsel subjected Dr. Bussey to rigorous cross-examination which gave the jury ample opportunity to assess his bias and competence. Further, the jury had the benefit of contrary testimony from Dr. Zadoff's expert. With few exceptions, it is the province of the jury to assess bias and competence, and to determine the weight to be given particular testimony. *See Jones v. Otis Elevator Co.,* 861 F.2d 655, 663 (11th Cir.1988).

Although the parties hotly contested whether Dr. Zadoff's failure to insert chest tubes before leaving the hospital deviated from the applicable standard of care, we cannot say that the jury's verdict is against the *great* weight of the evidence. *See Rabun,* 678 F.2d at 1060. We hold, therefore, that the district court abused its discretion when it granted Dr. Zadoff's motion for a new trial on the failure to insert tubes allegation.

### B. *Failure to Alert Allegation*

▮ As an alternative theory of recovery against Dr. Zadoff, the administrator argues that, absent inserting chest tubes prior to leaving the hospital, Dr. Zadoff negligently failed to alert ICU personnel or Dr. Sasine (1) of the signs of a developing pneumothorax and (2) the need to be prepared to insert chest tubes at the first sign of a tension pneumothorax. The district court granted Dr. Zadoff's motions for a

JNOV and conditional new trial on this theory, concluding:

> Plaintiff's theory that Dr. Zadoff was negligent in failing to alert hospital personnel of the need to insert chest tubes at the first sign of a pneumothorax caused Mr. Rixey's brain death fails for lack of evidence on the issue of causation. The earliest point when any of the nurses or respiratory therapists could have suspected that Mr. Rixey had a pneumothorax was when he turned blue and developed cardiac arrythmia. At that point, Ms. Frazier and Ms. Segers promptly summoned the emergency room doctor, Robert Sasine. Sasine, Frazier and Segers all testified that they were aware of the risk of tension pneumothorax, and the need to promptly insert chest tubes if a tension pneumothorax appeared likely. Most importantly, there is no evidence to support Plaintiff's theory that if Sasine had begun insertion of chest tubes at 12:32 a.m., with the efforts to restart the heart coming later, that brain damage to Mr. Rixey would have been avoided.

The administrator offered credible evidence, through his expert witness, that given (a) Rixey's severe asthma, (b) the likely hole in his lung, and (c) his dependence upon a mechanical ventilator at unusually high settings, that Dr. Zadoff acted negligently in failing to alert Dr. Sasine and the nurses of the need to immediately insert chest tubes at the first sign of a tension pneumothorax. It is undisputed that Dr. Zadoff did not notify any hospital personnel about the air found in the X-ray and the risk of a developing tension pneumothorax.

The district court found, however, that Dr. Zadoff's failure to warn the nurses or the respiratory therapist could not have caused Rixey's death because (1) they could

---

indication to put a chest tube in this patient because he has got air present already indicating that there is a leak. He has got a dependence on the ventilator which is requiring unusually high settings, and even then not working as effectively as necessary, and they are increasing the pressure settings in order to try and overcome that problem, and you have got a situation where there is air trapped that is very

likely with severe asthma, so there is going to never be a release of pressure on this closed system, and you are continually trying to force air in, and it is going to start coming out the hole you know is there because there is air already present in the neck. So, if you put the chest tubes in on those indications alone, I don't think you would call it prophylactic.

not have "suspected" a pneumothorax until Rixey turned blue and developed cardiac arrythmia and (2) they were already aware of the risk of a tension pneumothorax. In granting Dr. Zadoff a JNOV on this basis, the district court improperly weighed the evidence, and failed to view the evidence in the light most favorable to the administrator. *See Rabun*, 678 F.2d at 1057.

The administrator also offered competent evidence that the nurses or the respiratory therapist could have suspected a pneumothorax prior to the code 99. First, although tension pneumothoraxes frequently occur suddenly, both West Paces's and Dr. Zadoff's experts acknowledged that they can also build up over time. Second, Janis Martin, the administrator's expert nurse witness, testified that Rixey exhibited signs of a developing tension pneumothorax prior to the code: (1) "air hunger" which necessitated an increase in the mechanical ventilator setting to its highest level; and (2) the need to give Rixey more frequent doses of morphine to combat restlessness. Martin also testified that before the subcutaneous air made its way to Rixey's scrotum, it would have had to pass across his chest and abdomen requiring "a lot of air and a certain period of time."

Under these circumstances, the jury could have reasonably concluded that, had Dr. Zadoff given the suggested warning, the nurses and the respiratory therapist (despite their general awareness of the risks of a tension pneumothorax): (a) would have attached greater significance to Rixey's increased restlessness and "air hunger"; (b) monitored Rixey more closely and discovered the air in his scrotum before he turned blue; and (c) would have notified Dr. Zadoff or Dr. Sasine before Rixey developed cardiac arrythmia.

We also find that the district court erroneously concluded that the administrator offered no evidence in support of his theory that Rixey's brain death could have been avoided had Dr. Zadoff given Dr. Sasine the suggested warning regarding the air in the x-ray and the need to immediately insert chest tubes at the first sign of a tension pneumothorax. First, Dr. Sasine,

in his deposition, testified that had he known about the air found in the X-ray, this information would have affected his judgment during the code because it would have raised the "probability of a tension pneumothorax." Although Dr. Sasine testified at trial that he would not have done anything differently had he been aware of this information, the jury could have reasonably disbelieved him, concluding that he would (1) have immediately inserted chest tubes (rather than spend valuable time diagnosing the problem) and (2) done so in the most expeditious fashion (under non-sterile conditions as did Dr. Zadoff when he quickly inserted the right chest tube upon arrival). Second, Dr. Bussey testified that Rixey would still be alive had chest tubes been inserted immediately after the code was called.

We find that the administrator offered credible evidence from which a reasonable jury could conclude (1) that Dr. Zadoff failed to alert hospital personnel of the signs of a developing pneumothorax and the need to be prepared to immediately insert chest tubes at the first sign of a tension pneumothorax, and that this failure (2) fell below the applicable standard of care, and (3) contributed to Rixey's brain damage. Consequently, we hold that the district court erred when it granted Dr. Zadoff's motion for a JNOV. *See Watts*, 842 F.2d at 309–10.

Further, because we cannot conclude that the jury's verdict is against the *great* weight of the evidence, we hold that the district court abused its discretion when it granted Dr. Zadoff a conditional new trial on this issue. *Hewitt*, 732 F.2d at 1556.

## III. West Paces's Post-trial Motions

### A. *Failure to Properly Monitor Allegation*

■ The administrator contends that West Paces's personnel negligently failed to detect the presence of subcutaneous air and to report it to Dr. Zadoff. The administrator's theory is that had Dr. Zadoff been informed of the presence of subcutaneous air, he would have suspected a ten-

sion pneumothorax and placed chest tubes in time to avoid a cardiac arrest.

The district court granted West Paces's motions for a JNOV and conditional new trial on this theory, concluding that even if the nurses were negligent in failing to discover and report subcutaneous air, this failure had no causal relationship to Rixey's death:

> With respect to Plaintiff's first theory of negligence, even if the nurses were negligent in failing to discover and report subcutaneous air, this failure had no causal relationship to Mr. Rixey's death. The only subcutaneous air which the record establishes was present before the tension pneumothorax occurred was that reflected on the x-ray obtained in the emergency room; Dr. Zadoff testified he realized on viewing this x-ray that there was subcutaneous air which he considered benign and unimportant. Therefore, the failure to advise him of what the x-ray showed was irrelevant.

 Under Georgia law, a hospital owes a duty of reasonable care to its patients, and may be held liable for the negligent acts and omissions of its nurses and other employees. *See Newton County Hospital v. Nickolson,* 132 Ga.App. 164, 207 S.E.2d 659, 661 (1974). Further, a nurse may be negligent in failing to properly monitor a patient. *See Richmond County Hospital Authority v. Dickerson,* 182 Ga.App. 601, 356 S.E.2d 548, 551 (1987).

We hold that the district court erroneously granted West Paces's motion for a JNOV on this theory of recovery. First, it is undisputed that at no time prior to the code did the respiratory therapist, Segers, or any of the nursing staff locate the subcutaneous air noted in the x-ray. Second, the administrator's expert witness, Martin, testified that the failure of West Paces's nurses and respiratory therapist to (1) detect subcutaneous air in Rixey's neck, and elsewhere, prior to the code, and (2) to notify Dr. Zadoff, fell below the appropriate standard of care. A reasonable jury could have found that West Paces's personnel negligently failed to discover and report subcutaneous air.

Moreover, despite the district court's conclusion that the failure to advise Dr. Zadoff of the air was irrelevant, evidence exists in the record from which the jury could reasonably conclude otherwise. First, as previously noted, Martin testified that proper monitoring would not only have lead to the detection of the air shown on the x-ray, but also to the increasing quantities of air which travelled through Rixey's body prior to the code, ultimately making its way to his scrotum which became "blown up like a balloon."

Second, despite Dr. Zadoff's testimony to the contrary, the jury could have reasonably concluded that he might not have been aware of the existence or the extent, of subcutaneous air reflected on the X-ray. Specifically, Dr. Zadoff's handwritten notes in the hospital record make no mention of air outside the lungs. It is only in a typewritten dictation, dated April 20, 1986, after the incident, that Dr. Zadoff mentions reviewing the X-ray and finding "no acute infiltrates, no pneumothorax noted." Dr. Zadoff subsequently crossed out the typed in date and inserted, in handwriting, April 19, 1986. One reasonable inference the jury could have drawn from this exhibit is that Dr. Zadoff simply missed the subcutaneous air when he read the X-ray. The jury could also have concluded that had the nurses or the respiratory therapist advised Dr. Zadoff of the existence of subcutaneous air reflected in the X-ray as well as the subcutaneous air in Rixey's body, which according to Martin, accumulated subsequently and was discoverable, Dr. Zadoff would have altered his course of treatment.

Under these circumstances, where the district court weighed disputed evidence and failed to view that evidence in the light most favorable to the administrator, we hold that the district court's grant of a JNOV was improper. *Rabun,* 678 F.2d at 1057.

Further, we agree with the administrator that the district court abused its discretion in granting West Paces a conditional new trial because the jury's verdict is not against the great weight of the evidence. *Rabun,* 678 F.2d at 1060.

## B. *Failure to Notify Allegation*

■ Alternatively, the administrator contends that the respiratory therapist, Barbara Segers, negligently failed to promptly report to Dr. Sasine, when he arrived at the code, that she had discovered air in Rixey's scrotum. The administrator's theory is that had Dr. Sasine been made aware of the distended scrotum, he would have immediately inserted chest tubes, thereby avoiding brain death.

The district court granted West Paces's motions for a JNOV and a conditional new trial on this theory. First, the district court discredited Segers's testimony regarding when she discovered the scrotal air:

> While the court accepts the general proposition that the jury was entitled to reject the testimony of witnesses Sasine, Sanders, Chappell, Vanzo, and Frazier, and accept the testimony of Ms. Segers regarding the time when Dr. Sasine was told of the scrotal air, the jury was not entitled to credit only half of Segers's testimony—namely that she had discovered the air before the code was called—but discredit the other half that she had immediately reported same to Dr. Sasine and that chest tubes were inserted within a minute or two. There simply is no principled basis for the jury to have done this.

Second, the district court concluded that no evidence existed to support a theory that such delay caused Rixey's brain damage. According to the district court, had Dr. Sasine been informed of the scrotal air immediately upon his arrival, Rixey would have likely died anyway because of the time it took Dr. Sasine and Dr. Zadoff to insert chest tubes.

We reject the district court's conclusion that insubstantial evidence supports the administrator's theory of recovery. Segers testified that Rixey's scrotum was "blown up like a balloon," and that this discovery occurred prior to the cardiac arrest and sounding of the code. Significantly, the only person present with Segers immediately before the code, Nurse Frazier, testified in prior sworn deposition testimony (which she contradicted at trial), that she was unsure when the scrotal air was discovered. Segers also qualified her testimony regarding the timing of the insertion of the chest tubes by noting that "it seemed much quicker to me" than seventeen minutes.

Given that Segers's testimony regarding when she told Dr. Sasine about the scrotal air (unlike her testimony regarding the time of discovery) was unequivocally contradicted by members of the code team, the jury could have reasonably credited Segers's testimony regarding the discovery of the scrotal air, and yet rejected her testimony regarding when she notified Dr. Sasine. A jury is not required to accept "all or none" of a witness's testimony; rather, a jury may accept those portions of a witness's testimony which it considers credible and reject other portions which it finds to be improbable. *See* Pattern Jury Instructions (Civil Cases), Eleventh Circuit, Basic Instruction No. 3–Credibility of Witnesses (1990 ed.). Assuming that Segers discovered the scrotal air prior to the code, but failed to report it to Dr. Sasine when he arrived, the administrator offered competent expert testimony that such a failure would represent a deviation from the appropriate standard of nursing care.

Finally, we find that the district court erroneously concluded that "there is no way a jury could permissibly conclude that a different sequence of events would likely have averted Mr. Rixey's brain damage." First, Dr. Bussey testified that the timely insertion of chest tubes would have prevented Rixey's death:

> I think the fact that he was still able to respond even after the prolonged code had been going on and the fact that once they got the tension pneumothoraces treated they were able to start his heart and it beat effectively means if they had been able to do that in a timely fashion that his brain would not at that point, of course, have been damaged to the extent he was brain dead. In other words, ... his brain was dead because of the extended period of time it took to recognize and properly treat a tension pneumothorax.

Second, no expert offered testimony to the effect that Rixey's brain death was inevitable, or even likely, regardless of when Dr. Sasine learned of the scrotal air. Indeed, as Dr. Sasine testified, "some people ... are unresponsive or arrested for a long period of time and yet come back." Similarly, West Paces's expert nurse, Paula House, testified that she has had experiences with patients, usually young people, who have had an arrest, been without oxygen for awhile, appeared to be brain dead, and have come back to life. Further, when asked whether such cases are "uncommon," House responded, "I'm hesitant to use the word common. We see it." In light of this evidence, we find that a reasonable jury could have concluded that the delay in inserting chest tubes, occasioned by Segers's failure to immediately inform Dr. Sasine about the scrotal air, contributed to Rixey's brain damage. *See Parrott v. Chatham County Hospital Authority*, 145 Ga.App. 113, 243 S.E.2d 269, 270–71 (1978).

We hold that the district court improperly granted West Paces's motion for a JNOV, and abused its discretion when it granted West Paces a conditional new trial on this issue.

## CONCLUSION

In sum, we hold that the district court erred when it granted Dr. Zadoff's and West Paces's motions for JNOV and new trials. Accordingly, the district court is reversed, and the case is remanded to the district court for proceedings consistent with this opinion.

REVERSED and REMANDED.